UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X
                                                      :
HEATHER GRABIN,                                       :
                                                      :
                                Plaintiff,            :
                                                      :
                v.                                    :
                                                      :
MARYMOUNT MANHATTAN COLLEGE,                           :
                                                      :
                                Defendant.            :
                                                      :
-----------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  June 10, 2014

12 Civ. 3591 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Heather Grabin[1] initiated this action in May 2012, alleging that
Defendant Marymount Manhattan College discriminated against her on the
basis of her disability, in violation of Section 504 of the Rehabilitation Act, 28
U.S.C. § 794.  Specifically, Grabin contends that Marymount discriminatorily
failed to accommodate her disability, after she missed several classes in a fall
2010 web design course due to various hospitalizations and illnesses.
Marymount has moved for summary judgment on Grabin's claim, arguing that
Grabin is not disabled; that it was unaware of her claimed disability; and that
it did not fail to accommodate her disability.  For the reasons discussed in this
Opinion, material issues of fact preclude summary judgment, and on that
basis, Marymount's motion is denied.

---

[1]     Plaintiff initiated this action along with Sophia Harrell, who has since settled her claims
        with Marymount.  (*See* Dkt. #29).

## BACKGROUND[2]

### A.    Factual Background[3]

Heather Grabin was an undergraduate student at Marymount Manhattan College ("Marymount" or the "College") between September 2008 and December 2010, with a declared major in Communication Arts.  (Def. 56.1 ¶¶ 3-4).  Grabin was scheduled to graduate in the fall of 2010, upon completion of her fall courses.  (DeInnocentiis Decl. ¶ 4).

---

[2]    The facts stated herein are drawn from the parties' submissions in connection with the instant motion.  These include Defendant's 56.1 Statement ("Def. 56.1"), and Plaintiff's response thereto ("Pl. 56.1 Response"); Plaintiff's 56.1 Counterstatement ("Pl. 56.1"), and Defendant's response thereto ("Def. 56.1 Response"); as well as the materials attached as exhibits to the Declarations of Peter Beadle ("Beadle Decl.") and Locksley Wade ("Wade Decl.").  References to deposition transcripts and declarations will be styled as "[Name] Tr." or "[Name] Decl."  For convenience, Defendant's opening brief will be referred to as "Def. Br."; Plaintiff's opposition as "Pl. Opp."; and Defendant's reply as "Def. Reply."

Citations to a party's 56.1 Statement incorporate by reference the documents cited therein.  Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent … controverting any statement of material fact[] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

[3]    The parties have presented a record that, despite Defendant's assertions to the contrary, is teeming with disputed facts.  For example, the parties rest their submissions almost entirely on the deposition testimony of two witnesses — Heather Grabin and Blake Carrington — yet these two protagonists have diametrically opposed recollections of the relevant events.  An additional complicating factor is that the deposition testimony, to the extent that it is not rendered incomprehensible as a result of defense counsel's distracting conduct and infighting between counsel, references a number of documents and medical records, and the lack of supporting documents or records.  However, the parties have not seen fit to submit those materials to the Court, or to move for an adverse inference based upon their absence.  For this reason, the record before the Court is woefully inadequate, and material facts are plainly in dispute.

In the fall of 2010, Grabin enrolled in Communications 225, or "Digital Media I Web Workshop" ("Comm 225"), which was taught by visiting professor Blake Carrington. (Def. 56.1 ¶¶ 6, 8; Carrington Tr. 5). Grabin ultimately received a grade of "UW," or unofficial withdrawal, in Comm 225. (Def. 56.1 ¶ 7). Grabin enrolled in three other courses that semester, and received passing grades in those courses. (*Id.*). As a result of the "UW" grade in Comm 225, Plaintiff did not obtain the necessary number of credits to graduate that semester. (DeInnocentiis Decl. ¶ 7).

### 1.    Grabin's Alleged Disability

Grabin testified to the following at her deposition: Shortly after her birth on October 22, 1987, Grabin was diagnosed with thalassemia, which is a genetic blood disorder that causes severe anemia. (Grabin Tr. 22, 50). As a result of her thalassemia, Grabin experiences shortness of breath and tiredness, numbness in her limbs, and fainting and blackouts; she is also highly susceptible to infections, which often result in hospitalization. (*Id.* at 47-48). In support of her testimony, Plaintiff has submitted a medical journal article regarding thalassemia generally. (*See* Wade Decl. Ex. 1). However, Plaintiff has not submitted any medical records pertaining to her thalassemia in connection with this motion, despite testifying to their existence in her deposition.

Defendant contends that Plaintiff's infections constitute transitory impairments that do not rise to the level of disability, but it, too, has introduced no evidence tending to disprove or cast doubt upon Grabin's sworn

testimony that her frequent infections and hospitalizations are a result of, and to some degree caused by, her thalassemia.  (*See* Def. Br. 3-4).

### 2.    Marymount's Disability Policy

Marymount has an Office of Disability Services ("ODS"),[4] which is tasked with providing students assistance in obtaining reasonable accommodations where their disabilities require it.  (Def. 56.1 ¶ 32).  Marymount's website and student handbook provide a description of the services offered by the ODS, as well as its policies for registering with that office.  (*Id.* at ¶ 33).  Those policies provide that students requesting an accommodation due to a qualifying disability should register with the ODS by the end of the third week of classes, or immediately following a qualifying event occurring after the beginning of the school year.  (*Id.* at ¶ 34).  The policy also states that "[i]nforming other College offices, faculty, or staff does not constitute registering with the office."  (*Id.*).

The ODS requires students to submit certain documentation in order to register as a disabled student.  (Def. 56.1 ¶¶ 11, 35).  In particular, they must submit documentation from the last three years from a "qualified professional"; the documentation must indicate that the individual has an "impairment that substantially limits a major life activity," and must reflect, among other things, the severity of the impairment and the recommended academic and non-academic accommodations for that impairment.  (*Id.* at ¶ 35).

---

[4]     Carrington also appears to refer to the "Office of Academic Access," when referring to the ODS.  (*See, e.g.*, Carrington Tr. 52-53).  Grabin, however, refers to the "Office of Student Affairs," and testified that the ODS is situated within the "Office of Student Affairs."  (Grabin Tr. 78).  It is unclear whether, and to what extent, these are separate offices at Marymount.

### 3.   Grabin's Attempts to Report Her Disability to Marymount

According to Defendant, the ODS has no record of any request from Grabin to register as a disabled student, and contends that it was never provided with a "written doctor's diagnosis explaining that she had a disability and as a result of this illness she would require reasonable accommodations." (Def. 56.1 ¶ 36).

Grabin testified, conversely, that she informed a number of Marymount personnel of her disability prior to the fall of 2010.  First, when Grabin transferred to Marymount in the fall of 2008, she reported that she suffered from thalassemia on "orientation paperwork" submitted to an administrator named Misty Beasley, and on the paperwork she submitted to the student housing department.  (Grabin Tr. 49, 55).  However, Plaintiff has not submitted this paperwork to the Court in connection with this motion.

When she enrolled at Marymount, Grabin did not ask for any special accommodations for her thalassemia, because she did not feel that she needed an accommodation, since she could "find[] ways to accommodate [herself] for the special things [she] needed."  (Grabin Tr. 57).  Grabin further testified that initially, she did not obtain a "disability card" from the "Office of Student Affairs," because she was not "offered one."  (*Id.* at 62).  Grabin contended that she was never informed that she had to report any physical condition that might impair her ability to perform in school.  (*Id.* at 63-64).

In the fall of 2009, Grabin reported that she had thalassemia to Peter Naccarato, who was an associate dean at Marymount.  (Grabin Tr. 53-54, 72).

Grabin had fallen ill that semester, specifically, she had tonsillitis resulting in a throat abscess, and had requested "reasonable accommodations" in her coursework.  (*Id.* at 72-74).  Grabin asked to be registered with the "Office of Student Affairs" as a disabled student.  (*Id.* at 78).  Naccarato told Grabin that she was "not qualified," and in response to her request for "breaks," he replied, "too bad."  (*Id.* at 72).  Grabin spoke with other administrators in "Student Affairs" at this time regarding her disability and requested accommodations, but they were unable to help her.  (*Id.* at 74-76).  Thus, when Grabin was asked at her deposition whether she registered her disability with the College in the fall of 2009, she responded that she "tried to," but was unsuccessful in doing so.  (*Id.* at 77).

### 4.    Fall 2010 Communications 225 Course Requirements

#### a.    Course Requirements

The syllabus to Comm 225 warns that three unexcused absences will result in failure of that course.  (Beadle Decl. Ex. E).  The syllabus also states that the students are required to complete a major group project, and that their grades will be based upon the number of points they are awarded for that project, along with other assignments throughout the semester.  (*Id.*).

The syllabus to Comm 225 includes a paragraph notifying students that they should register with the ODS in order to receive disability accommodations.  (Beadle Decl. Ex. E).  Similarly, Carrington testified that "at the beginning of every semester as we are going through the syllabus with the class, there is always a special paragraph about accessibility, disability, where

6

I let the entire class know that if you have any special needs whatsoever, please approach me outside of class via e-mail, however you feel comfortable with doing so.  And thus I let it be known on the first day of class that it is the student's responsibility to approach me and make that first step."  (Carrington Tr. 70-71).

There is considerable dispute in the record regarding nearly every aspect of the Comm 225 course.  However, it is undisputed that Grabin received a "UW" or unofficial withdrawal, as her grade; in other words, Grabin did not pass the course.  Carrington gave two reasons for Grabin's lack of passing grade: first, that she missed a number of assignments, and ultimately received a grade of 20 points out of a possible 100, and second, that she had three unexcused absences in November 2010.  (Carrington Tr. 15, 30, 97).  Plaintiff agrees that she missed these classes, but contends that they were excused absences, since she was either hospitalized or in a doctor's office during those absences.  (Grabin Tr. 195).  Notably, however, Plaintiff disputes that she missed, or failed to turn in any assignments.  Each of these topics will be discussed in turn.

### b.    Missing Assignments Prior to November 2010

Carrington testified that he e-mailed Grabin in mid-October 2010 to notify her that she had received "mostly zeros up to that point," perhaps because she had had trouble submitting her assignments to the proper online course folder.  (Carrington Tr. 97-98).  Carrington testified that he offered to "figure this out" with Grabin, and that "if [she] had actually done [the

assignments], let's work together to get this in the proper place on the [online course folder]." (*Id.* at 97; *see also id.* at 110 (Carrington testifying that he told Grabin, in that same e-mail, that he would give Grabin credit for the assignments that were placed in the incorrect folder)). However, it does not appear that, even if those assignments were later placed in the correct folder, Carrington awarded Grabin credit for them. (*Id.* at 97-98).

Grabin similarly testified that she received an e-mail from Carrington at some point in the fall of 2010, notifying her that she had failed to submit approximately four assignments to the proper online course folder. (Grabin Tr. 175-76). Grabin recalled that during the next class, Carrington showed her the proper folder, and placed her assignments in that folder. (*Id.* at 175-78). Carrington then confirmed with Grabin that the assignments were in the proper folder, and asked her to send him an e-mail "so [he] [knew] to go back in [his] grade book and fix it." (*Id.* at 179). Neither party has submitted any of these e-mails in connection with this motion. Moreover, Grabin later learned during a grade appeal the following year that she had received a zero for each of those assignments. (*Id.*).

Grabin does not recall any further conversations with Carrington that semester regarding any missing assignments. (Grabin Tr. 178). Grabin testified that she completed each project that was assigned by Carrington in the fall of 2010. (*Id.* at 223).[5]

---

[5]     In reply, Defendant argues that the Court must disregard this testimony because Plaintiff has submitted "no documentary evidence [] to refute the records of the Professor showing that she had failed to hand in numerous assignments." (Def.

### 5.     Grabin's Illness-Related Absences

Grabin contends that she missed four Comm 225 classes in the fall of 2010: three in November and one in December.  (Grabin Tr. 195).  Grabin was aware that, according to the syllabus, three or more unexcused absences would result in failure of the course.  (*Id.*).  However, Grabin understood that "if [she] was hospitalized and ill, [her] absences would be excused."  (*Id.* at 196).  Grabin was either hospitalized or in the doctor's office during each of the four absences.  (*Id.* at 196-97).  Specifically, Grabin contracted E. Coli and tonsillitis during that semester, and was hospitalized three to four times between November and December.  (*Id.* at 194-97).  Grabin testified that she was informed by her doctors that those infections were related to or resultant from her thalassemia.  (*Id.* at 202).  However, Grabin has not submitted any medical records pertaining to these hospitalizations in connection with this motion.

### a.     E. Coli Infection

Grabin contracted an E. Coli bacterial infection in late October or early November 2010, and missed one Comm 225 class as a result.  (Grabin Tr. 200-02).  Grabin e-mailed Carrington after her first absence to ask to speak to him over the phone about the work she had missed.  (*Id.* at 201).  Grabin testified that she later presented Carrington with a doctor's note so that the absence

---

Reply 5).  Defendant appears to refer to Carrington's "grade sheet," a document that appears to have been presented to both witnesses during deposition testimony to show that Grabin did not submit her assignments, yet not to the Court in connection with this motion.  (*See, e.g.*, Grabin Tr. 314-20; Carrington Tr. 97).  Defendant failed to introduce these records in the first place, and even if they had submitted the relevant materials to the Court, at best, this would create a disputed issue of material fact in light of Plaintiff's deposition testimony to the contrary.

would be excused; Grabin did not follow up with Carrington to determine whether the absence was in fact excused.  (*Id.* at 219).  Neither party has submitted this e-mail, or this doctor's note, in connection with this motion.

### b.   Tonsillitis

Grabin contracted tonsillitis in November 2010.  (Grabin Tr. 203-04).  The infection was severe, and Grabin was hospitalized several times that month due to a high fever and an abscess in her throat, the latter of which prevented her from swallowing or speaking.  (*Id.* at 150).

Around mid- to late-November, Grabin e-mailed Carrington; she stated that she was aware that she was missing work, and asked him for "some suggestions on how [she could] complet[e] th[e] course."  (Grabin Tr. 236).  Carrington "ignored that e-mail."  (*Id.*).  Around that time, Grabin sent a separate e-mail to Carrington, the substance of which was: "Hi, Professor, I'm in the hospital.  I'm very sick.  I know that I missed this, [but] please tell me if there is anything that I can do that you feel would be fitting for this, for my absences."  (*Id.* at 238).  Carrington testified, somewhat relatedly, that he received an e-mail around this time from Grabin "explaining that she had had a fever and she was sick; and that … she would give [Carrington] a doctor's note, which [he] never received."  (Carrington Tr. 111-12).  However, Grabin testified that she presented Carrington with several doctor's notes in December 2010 asking that the three absences in November 2010 be excused.  (Grabin Tr. 220).

10

Conversely, Carrington testified that around mid-November 2010, he e-mailed Grabin to tell her that she was "in danger of failing the course due to her failure to hand in assignments and also because of the intense group work that we were doing in class, and that she would have to work very, very hard to actually pull through and pass the course." (Carrington Tr. 15-16). Neither party has submitted any of these e-mails to the Court in connection with this motion.

When asked whether, at that time, Carrington offered any assistance to Grabin, Carrington replied that he offered his assistance in "get[ting] those assignments finished," but that "[Grabin] would need to be in class for that to happen." (Carrington Tr. 116).

### 6. Late November Correspondence with Marymount Officials

Grabin was hospitalized for six days at the end of November 2010; during that time, Grabin reached out to Carol Jackson, the director of the Office of Academic Access at Marymount. (Grabin Tr. 409, 422; Carrington Tr. 87).[6] Grabin testified that she spoke with Jackson about her missed classes, and Jackson had the following response:

> I spoke to her about it and [Jackson] said, listen, honey, do not worry, I will talk to everybody. I said do you need notes from the doctors, anything like that. She said I already spoke to the doctors, that's taken care of. Everything will be taken care of. I already informed

---

[6]  The record does not include deposition testimony from Jackson, to the extent she was deposed in connection with this action. Nonetheless, Jackson submitted a declaration in connection with this motion, and identifies herself as the Vice President for Student Affairs and Dean of Students at Marymount. (See Jackson Decl. ¶ 1). It is unclear whether she was previously the director of the Office of Academic Access, or whether these titles refer to the same position. See n.4, supra.

> them. And just keep us posted on your health, you
> know, we want to make sure you're okay.  And she is
> the person that's in charge of things of this nature. So
> while I was in the hospital I thought everything would
> be okay.

(Grabin Tr. 409).  In her declaration, Jackson averred that Grabin never

"registered with the Office of Disability Services" or provided "a written doctor's

diagnosis" regarding her disability.  (Jackson Decl. ¶¶ 6-7).  However, the

declaration is, curiously, silent regarding Jackson's numerous conversations

with Grabin in December 2010.  In fact, Grabin's testimony suggests that

Jackson played a perhaps pivotal role in Grabin's requests for accommodation,

yet Defendant has done nothing to controvert or contradict that testimony.

Plaintiff has submitted a copy of e-mail correspondence that relates to,

but does not completely corroborate, her conversation with Jackson in

November 2010.  (*See* Wade Decl. Ex. 2).  That correspondence reveals that on

November 30, 2010, Nicole Barry,[7] a medical assistant at Marymount, e-mailed

Jackson to report that Grabin had been admitted to Beth Israel Hospital on

November 29 for "severe tonsillitis" and a "high grade fever," and noted that

"Heather informed me she is very concerned/worried about her studies and

professors due to missing classes.  I notified her that I would inform you

regarding this matter."  (*Id.*).  Jackson replied that day, and promised to

forward Barry's e-mail to Michael Salmon,[8] who was at that time the Dean of

---

[7]     The record does not include deposition testimony from Barry, to the extent she was
        deposed in connection with this action.

[8]     The record does not include deposition testimony from Salmon, to the extent he was
        deposed in connection with this action.

Students, so that he could advise the faculty members; several hours later, Jackson reported that "all of [Grabin's] instructors have been notified, as requested." (*Id.*).

Likely as a result of this communication, on November 30, 2010, Melissa Weeks, who worked in Salmon's office at the time, circulated an e-mail to Grabin's professors reporting that she was in the hospital, and asking that her absence be excused. (Carrington Tr. 14, 15). Because of this e-mail, Carrington excused Grabin's December 2, 2010 absence only. (*Id.* at 15). Defendant has not produced a copy of this e-mail in connection with this motion.

When asked whether, upon learning that Grabin was in the hospital, he "took any steps to assist [Grabin] with her work," Carrington answered that he wrote Grabin an e-mail to "offer[] [his] condolences for being in the hospital, and I left it at that." (Carrington Tr. 113-14; Grabin Tr. 204 (testifying that Carrington sent her an e-mail saying "get well soon")). Again, the parties did not submit this e-mail in connection with this motion.

Lastly, although Carrington was aware that Grabin was "sick" around that time, he made no "further inquiry as to the nature of her illness." (Carrington Tr. 113-14). Carrington did not refer Grabin to ODS, the "Office of Academic Access," or the "Office of Student Support Services" to assist her because he was "never made aware of her needs." (*Id.* at 52). When asked again why he did not refer Grabin to those offices, Carrington responded that "when she missed certain classes and claim[ed] she was sick, these particular

13

illnesses that she described would not warrant being forwarded to these offices." (*Id.* at 54-55). But Carrington also conceded that he did not speak to Grabin about those illnesses. (*Id.* at 55).

### 7. Grabin's Early December 2010 Meetings with Carrington and Salmon

#### a. Communications with Carrington

Shortly after November 30, 2010, Carrington informed Grabin that because she had "missed a lot of class" and had "turned in hardly any assignments," his recommendation was that she withdraw from the course, instead of receiving a failing grade. (Carrington Tr. 11). As a result, on or about December 2, 2010, Grabin met with Carrington regarding her absences from Comm 225. (Grabin Tr. 225).

The major project for Comm 225 was to build a group website; Grabin was assigned to a group with two to three other people. (Carrington Tr. 33). Carrington testified that Grabin received a zero for this assignment, because she failed to participate in the group work, or to attend the group meetings that were held outside of class during November and December. (*Id.* at 36-37). Carrington learned that Grabin did not participate in group meetings by speaking with the other students in Grabin's group. (*Id.* at 37). Grabin, however, contends that she worked with her group during every single class, and that she missed only one out-of-class group meeting, while she was hospitalized in November 2010. (Grabin Tr. 174-75).

Grabin's intention in meeting with Carrington on December 2, 2010, was "to see if [she] could have extra time to complete the group project on my own,

14

or how I could complete [] the work that I had missed when I was hospitalized."
(Grabin Tr. 225).  Grabin had told Carrington prior to that meeting, by e-mail,
that she would "do anything" to make up the missed work, and asked that he
simply "tell [her] what to do."  (*Id.* at 228).  Grabin estimated that she had
missed approximately half of the group work due to her hospitalizations in
November.  (*Id.*).  The parties have not submitted a copy of this e-mail in
connection with this motion.

At their meeting, Grabin asked if she could make up the missed group
work, but Carrington refused.  (Grabin Tr. 228).  He did not give a reason why,
but "was very short and wouldn't get into details" with Grabin.  (*Id.* at 227-28).
Grabin testified that

> I had told him tell me anything you want me to do.  I'll
> do the whole project by myself, because it was a group
> project.  I will do anything that you think would be
> fitting.  I just need this diploma.  So I don't care if I have
> to sit in the computer lab for, you know, two weeks
> straight.  I will do anything that you think would be
> great or if you want to talk to Laura Tropp or Dean
> Salmon and get back to me. And he said there is
> nothing. Laura Tropp said, no.  I'm telling you, no, there
> is nothing.  And I said, okay, well, then can you put that
> in an e-mail to me.  Because I wanted to meet with Dean
> Salmon then because I wanted him to see that as the
> previous conversation. Here it is in writing, I'm not —
> you know, this is it.  It's black and it's white.  He is not
> willing to work with me in any way.

(*Id.* at 406-07).  Grabin described this exchange as evidence that she was
denied reasonable accommodations.  (*Id.* at 405-07).

Carrington did not mention any other missing work at that meeting.
(Grabin Tr. 229-30).  However, Carrington did inform Grabin that her absences

were a reason why he intended to fail her.  (*Id.* at 233).  Carrington did not

explain why her absences had not been excused.  (*Id.* at 234).  Instead, he

stated that she had "missed too much of the work," and that he didn't see any

way that he could allow her to make it up, or give her additional projects.  (*Id.*

at 234-35).  Carrington then informed Grabin that it was "unfortunate that

[she] was sick," but that she should withdraw from his class, or else he would

"fail [her]."  (*Id.* at 214, 227).

     When asked whether Carrington suggested that the reason he was failing

Grabin was because of her putative disability, Grabin testified in the

affirmative:

> When I sat down with [Carrington] and had the meeting
> I expressed to him, you know, all my medical concerns
> and everything.   And he said, Heather, that doesn't
> matter, you missed class time, you missed the group
> project.  He said people have excuses all the time, but,
> you know, that's what it is and I advise you to
> [medically] withdraw from my course....   He didn't
> accept [my medical conditions] as a reason that I
> couldn't make it to class.  I was still able to do the work.
> He just wasn't willing to give me the opportunity to....
> He more or less said I don't care [ ] what is wrong with
> you, you still didn't make it to class.  And just because
> you have this disability doesn't make it okay for you to
> not come, whether you were in the hospital or not.

(Grabin Tr. 415-16).  By contrast, when asked if Grabin requested any

assistance or accommodation to complete the course, Carrington recalled that

"[s]he did not ask for any special accommodation.... At no point did she ever

bring up the notion that she needed special accommodations ... through the

Office of Academic Access and Student Support Services."  (Carrington Tr. 69-

70).

Grabin asked Carrington to put his recommendation to medically withdraw into writing for her, because she intended to speak with the Dean of Students, Michael Salmon, about the issue. (Grabin Tr. 228, 233-34). Carrington informed Grabin that she had to speak to Linda Tropp, another Marymount administrator, if Grabin disagreed with his decision. (*Id.* at 302).[9] Tropp subsequently told Grabin that she should withdraw from the course, which is ultimately what Grabin did. (*Id.*).[10]

In connection with this motion, the parties have submitted an e-mail chain that includes a December 9, 2010 e-mail from Carrington to Grabin. That e-mail was copied to Linda Tropp, and reads

> Hi Heather, putting it in writing for you that because of your absences (Nov 4, 11, 18, Dec 2), I don't see any possibility of making up the material we've covered in the COMM255 course. Outlined in the syllabus it says that 3 absences will result in failure of the course. The material has been very difficult for everyone else who has been working on it every week, and I don't see a way you can catch up on your own after missing the many hours of instruction I've given them in class and the many hours they've worked together in groups outside of class. My recommendation for you is to consult with Dean Salmon and withdraw from the course. Best of luck.

(Beadle Decl. Ex. G; Wade Decl. Ex. 2 (same)). That same day, Tropp forwarded the e-mail to Dean Salmon and Peter Naccarato; Tropp wrote, "Blake

---

[9]   The record does not include deposition testimony from Tropp, to the extent she was deposed in connection with this action.

[10]   Grabin's testimony indicates that because Carrington planned to award Grabin a failing grade, she elected to withdraw from the course, resulting in a "UW" on her transcript, rather than an "F." (*See* Grabin Tr. 227).

Carrington [] plans to fail Heather Grabin," and noted that Grabin had

threatened to sue Marymount.  (*Id.*).  Salmon responded that day, saying:

> Actually, [Grabin] is scheduled to see me later this afternoon.  From what I gather, she was hospitalized for awhile, but I will need to see some documentation.  In any event, this may have nothing to do with the outcome of her grade in any given course.  I will keep you posted.

(*Id.*).

### b.    Communications with Salmon

Grabin testified that she met with Salmon a number of times in

December 2010.  (Grabin Tr. 297).  During those meetings, Grabin informed

him that she had missed classes and work because she had been ill with

various infections, and that those infections were resultant from, or related to,

her thalassemia.  (*Id.* at 423-24).

Initially, Salmon "almost didn't believe [Grabin] that [Carrington]

wouldn't, you know, work with [her] on graduating.  And [Salmon] gave [her]

some recommendations on maybe doing other projects and things of that

nature."  (Grabin Tr. 297).  Grabin testified that, on or about December 7,

Salmon

> said — word for word he said, Heather, surely there is something that Professor Carrington can do to devise a plan and maybe assign an alternate project.  And then he expressed that — he urged me to go speak with him and, you know, expressed to him that I had met with himself, Dean Salmon, and tell him I was willing to do an alternate project or do something on my own, but he just — he seemed like he thought, you know, maybe I was exaggerating the situation about him failing me.  So he just said, you know, just go to him politely and see, I'm sure there's something that can be done.  And so I

> thought, well, he's head of the school, you know, it
> seemed promising.  I brought all of my doctor[']s notes
> and everything to him.  And he had also spoken to Carol
> Jackson, who was in contact with my doctors.

(*Id.* at 382-83).

Plaintiff has submitted a copy of an e-mail chain between Tropp and

Salmon dated December 13, 2010.  (*See* Wade Decl. Ex. 2).  First, Grabin wrote

to Tropp, noting that she had been "trying to get in contact with Professor

Carrington," and seeking to arrange a group meeting with Grabin, Tropp,

Carrington, and Salmon.  (*Id.*).  Tropp forwarded that e-mail to Salmon, writing

"my view is that Prof. Carrington has made his position on attendance and her

grade clear.  If she wants to contest her grade once she has a grade, that is

fine…. But, what are your thoughts on this? I haven't actually met her — only

spoken to [Carrington]."  (*Id.*).  Salmon responded:

> I have already met with her, and explained that it is the
> prerogative of the instructor to determine whether her
> absences may be excused or not.   Seems to be the
> decision has been made, but she is unwilling to accept
> it.  Frankly,  although  I  do  know  that  she  was
> hospitalized for about a week, and may well have been
> sporadically ill, it's not our place to tell an instructor
> how to handle this issue…. In any event, not much else
> for us to do.

(*Id.*).

Similarly, Grabin testified that at a subsequent meeting with Salmon in

December 2010, Salmon told Grabin that "he couldn't force a professor to, [] do

anything," but expressed his incredulity that Carrington would not "meet

[Grabin] halfway or put together something for [her]."  (Grabin Tr. 298).

Salmon told Grabin that because she was passing her other courses that

semester, withdrawing for medical reasons would not be an option, in contrast to what Carrington had previously told Grabin.  (*Id.*; *see also id.* at 87 (Grabin noting that she did not want to withdraw from the semester because she was passing her other courses, and because her other professors were being "accommodating," and were "helping me complete my work" when she was hospitalized)).  However, Grabin testified that Salmon left the situation very "open-ended," "because he just — it seemed as if he didn't believe me that [Carrington] told me to withdraw from his course."  (*Id.* at 300).

### 8.    **Early 2011 Communications with Marymount**

Grabin e-mailed Carrington in January 2011, and asked to speak with him about the failing grade he had assigned her.  (Grabin Tr. 292).  Carrington did not respond to this request.  (*Id.*).  Grabin tried calling him approximately ten times, but received no response.  (*Id.*).  Grabin then spoke to at least seven separate administrators and professors[11] regarding the grade she had received in Comm 225.  (*Id.* at 292-95).

Grabin reached out to Salmon in January to "let him know that [Carrington] wasn't accepting of any of [Salmon's] recommendations."  (Grabin Tr. 297).  Plaintiff has submitted a copy of an e-mail dated January 9, 2011, from Grabin to Salmon, reporting that she had "tried to contact" Salmon, and that she had:

> taken it upon [herself] during break to learn a program
> and built a webpage in hopes that this could make up
> for the little work I missed while I was hospitalized.

---

[11]    The record does not include deposition testimony from any of these administrators or professors, to the extent they were deposed in connection with this action.

> Below is the link and I built the entire page for my own company which I had been building up during the past two years. I was wondering if you could relay this to Professor Carrington and see what we could do. Last time we spoke you told me to get in touch with him and he was not willing to compromise…. Hopefully we can all reach a fair resolution and put this matter behind us.

(Wade Decl. Ex. 2).

Grabin also reached out to Tropp, and submitted all of her projects to her, to show that she had completed the work for the course. (Grabin Tr. 305-06). However, Grabin did not produce copies of these projects in connection with this motion. Nonetheless, Grabin testified that when she was able to reach Tropp by phone and explained the situation, Tropp suggested still another course of action:

> [Tropp] said I don't know what you're talking about. Blake Carrington, it's the professor's decision. I have nothing to do with that. I advise you to do a grade appeal. And in order to do a grade appeal you need to first schedule either an in person … or a phone meeting with the professor [] as the first [] stages of it. And then I called her to follow up and then she hung up on me… because I had called her to just ask some questions because [Carrington] wasn't responding to me. And she [said] I can't help you with this. I [replied] I'm begging you, please … and then she [] said I'm done with this and she hung up.

(*Id.* at 390-91).

In connection with this motion, Carol Jackson averred that the grade was not changed because "[a]cademic standards and princip[les] of academic freedom prohibit the College from intervening to force a professor to change the

grade awarded to a student absent a showing that the professor acted unfairly or improperly in determining the grade." (Jackson Decl. ¶ 8).

### 9.    Grabin's Grade Appeal

Grabin ultimately appealed the grade through Marymount's appeal process. In approximately April 2011, Grabin learned from Tropp that her appeal had been denied. (Grabin Tr. 307-08). When Grabin asked for an explanation, Tropp stated that

> although [Grabin] had a serious condition and [] missed classes, it does not mean that [those absences] were excused with the doctor's notes. And [...] the fact that [Grabin] missed classes, whether they were excused or not, is grounds for failure. And Professor Carrington turned in [his] grading sheet, that he keeps his grades on, and [Grabin] didn't complete 80 percent of [the] projects for the course.

(*Id.* at 308). Grabin testified that this was the first time she had heard that 80 percent of her projects were still missing. (*Id.*). Grabin then appealed that decision to an appeals committee, and sent a letter informing Marymount that Carrington had made "false statements" about the missing assignments. (*Id.* at 310-11). Grabin's request to appear before the committee was denied. (*Id.* at 415-16). In or about late October 2011, Grabin learned that her final appeal had been denied. (*Id.* at 416-17). The parties have not submitted any documents related to the grade appeal in connection with this motion.

To date, Grabin has not obtained her college degree; she needs the credits from Comm 225, or a similar course, in order to satisfy her degree requirements. (Grabin Tr. 418-19; DeInnocentiis Decl. ¶ 7). Grabin indicated

during her deposition that she did not retake the course because she lacked the money to do so.  (Grabin Tr. 418-19).

## B.     Procedural History

Grabin initiated this action on May 7, 2012, along with another former student at Marymount, Sophia Harrell, alleging violations of the Rehabilitation Act in connection with Marymount's alleged failure to accommodate Plaintiffs' disabilities.  (Dkt. #1).  Marymount answered on June 22, 2012.  (Dkt. #4). The parties were referred to Magistrate Judge James L. Cott for settlement purposes in July 23, 2012, and the parties settled Sophia Harrell's claims in or about April 2013.  (Dkt. #29).  The parties proceeded to discovery in January 2013 (*id.*), and after a number of extensions of the time in which to do so, and a particularly contentious discovery process, the parties concluded discovery in November 2013 (Dkt. #46).

Pursuant to the briefing schedule set forth at the November 21, 2013 pre-motion conference (Dkt. #47), and amended on January 6, 2014 (Dkt. #51), Defendant moved for summary judgment on January 27, 2014 (Dkt. #52). Plaintiff filed her opposition on March 10, 2014 (Dkt. #59), and the motion was fully submitted as of the filing of Defendant's reply on March 24, 2014 (Dkt. #63).

## DISCUSSION

## A.     Summary Judgment Motions Generally

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any

material fact and the movant is entitled to judgment as a matter of law."  *See*

*Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence

of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is

"material" if it "might affect the outcome of the suit under the governing law,"

and is genuinely in dispute "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see also*

*Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).

The movant may discharge this burden by showing that the nonmoving party

has "fail[ed] to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the

burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y.*

*Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment

appropriate where the non-moving party fails to "come forth with evidence

sufficient to permit a reasonable juror to return a verdict in his or her favor on

an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set

out specific facts showing a genuine issue for trial" using affidavits or

otherwise, and cannot rely on the "mere allegations or denials" contained in the

pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-

24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party

"must do more than simply show that there is some metaphysical doubt as to

the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

**B.   Application**

> **1.   Material Issues of Fact Preclude Summary Judgment on Plaintiff's Rehabilitation Act Claim**

>> **a.   The Rehabilitation Act Generally**

Section 504 of the Rehabilitation Act applies to programs receiving federal financial assistance, such as Marymount, and provides that "'[n]o otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under' any covered program or activity." *Powell* v. *Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir. 2004), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004) (quoting 29 U.S.C. § 794(a)).  In order to establish a *prima facie* violation of Section 504, a plaintiff bears the burden of demonstrating that: (i) "she is a 'qualified individual' with a disability"; (ii) the defendant is "subject to Section 504"; and (iii) "she was 'denied the opportunity

25

to participate in or benefit from defendant['s] services, programs, or activities, or was otherwise discriminated against by defendant[], by reason of her disability.'" *Id.* (quoting *Henrietta D.* v. *Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (emendations in *Powell* omitted)); *see also Heilweil* v. *Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir. 1994) ("The plaintiff in a Rehabilitation Act suit bears the initial burden of establishing a *prima facie* case under the Act.").

The parties agree that Defendant is subject to Section 504, in satisfaction of the second prong; at issue here are the first and third prongs, namely, whether Plaintiff is a qualified individual, and whether she was discriminated against as a result of her disability.  For the reasons discussed throughout, material issues of fact preclude summary judgment on both issues.

### b.    Whether Plaintiff Is a Qualified Person with a Disability

A plaintiff must make three showings in order to demonstrate that she is disabled under the Rehabilitation Act, in satisfaction of the first prong: (i) plaintiff "suffers from a physical or mental impairment"; (ii) "plaintiff must identify the activity claimed to be impaired and establish that it constitutes a 'major life activity'"; (iii) "plaintiff must show that her impairment 'substantially limits' the major life activity previously identified."  *Weixel* v. *Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002) (internal citations omitted).  As relevant to this case, "a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system." 42 U.S.C. § 12102(2)(B).  Furthermore, "[a]n impairment that is episodic or in

remission is a disability if it would substantially limit a major life activity when active." *Id.* at § 12102(4)(D).

Plaintiff testified that she suffers from thalassemia, a genetic blood disorder, and that as result, she experiences severe anemia, exhaustion, and frequent infections and hospitalizations.  Plaintiff has produced a medical journal article about thalassemia, but has submitted no evidence in connection with this motion corroborating the fact that she has been diagnosed with thalassemia, or more importantly, that it affects a major life activity.  "Courts in the Second Circuit have consistently held that when a plaintiff fails to offer any medical evidence substantiating the specific limitations to which he claims he is subject due to his condition, he cannot establish that he is disabled within the meaning of the ADA." *Baerga* v. *Hosp. For Special Surgery*, No. 97 Civ. 0230 (DAB), 2003 WL 22251294, at *6 (S.D.N.Y. Sept. 30, 2003) (collecting cases, and citing, *inter alia*, *Heilweil*, 32 F.3d at 723 (plaintiff in Rehabilitation Act case who provided "no medical proof" substantiating her allegations that asthma limited her ability to work in certain environments did not produce sufficient evidence of substantial limitation to defeat motion for summary judgment)).

As Plaintiff bears the burden of proof on her *prima facie* case, her failure to submit corroborating documentation is potentially fatal to her claim. However, the Court finds that because both parties have failed to submit numerous relevant documents to the Court — in particular, documents specifically referenced during Grabin's and Carrington's depositions — it is not

27

appropriate to award summary judgment on this basis.  In point of fact,
Carrington referred to a number of e-mails and documents that were never
produced to the Court; and Plaintiff referred to a number of e-mails, records,
doctor's notes, doctor's diagnoses, and medical records in her deposition
testimony, none of which were produced to the Court.  (*See, e.g.*, Grabin
Tr. 220; Carrington Tr. 97).  If Plaintiff did produce these documents at trial, a
reasonable fact-finder could determine that she suffered from a disability,
namely thalassemia, and that the disability affected a major life activity,
namely the functioning of her immune system.  *See, e.g.*, *Alexiadis* v. *New York
Coll. of Health Professions*, 891 F. Supp. 2d 418, 430 (E.D.N.Y. 2012) (finding a
material issue of fact as to whether plaintiff's HIV-positive status constituted a
disability, where plaintiff had suffered from numerous infections, because it
substantially limited the major life activity of the functioning of his immune
system).

Defendant argues in response that Plaintiff's infections constituted
fleeting incidents that were unrelated to Plaintiff's thalassemia, and that
because Plaintiff was able to pass her other courses that semester, her major
life activities were not limited.  (Def. Br. 3-5; Def. Reply 6).  Yet in support of
these arguments, Defendant also fails to introduce any evidence or relevant
documents, but instead relies on the legal argument of counsel.  The record is
replete with material issues of fact as to whether Plaintiff is disabled, and the
extent to which her major life activities are limited.  While that same record
also indicates that relevant documents exist that could have supported or

28

contradicted Plaintiff's testimony, both parties have simply chosen — with respect to this claim and to the motion as a whole — not to submit them. Defendant is not entitled to summary judgment on this basis.

Plaintiff must also show that she is "otherwise qualified" in order to satisfy the first prong of her Rehabilitation Act claim. "A qualified individual with a disability is defined as a disabled person who, whether or not given an accommodation, 'meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" *Powell*, 364 F.3d at 84-85 (internal citation and quotation marks omitted). Material issues of fact also preclude summary judgment on this element. Plaintiff's testimony indicates that, if she had been permitted extra time, or additional instruction, she could have made up the in-class work she had missed while absent. *See generally* Background Sec. A(7). However, Carrington testified that Plaintiff simply could not make up the missed work. *Id.* On this basis, a reasonable fact-finder could determine that Plaintiff would have been qualified to pass Comm 225, if only she had been given a reasonable accommodation; conversely, a fact-finder could equally credit Carrington's testimony over Grabin's. Because material issues of fact preclude summary judgment as to whether Plaintiff is qualified for the purposes of the Rehabilitation Act, Defendant is not entitled to summary judgment on this claim.

### c.    Whether Defendant Failed to Accommodate Plaintiff's Disability

With respect to the third element of a Rehabilitation Act claim, i.e., whether Defendant discriminated against Plaintiff because of her disability, Plaintiff may base her claim on any of "'three available theories: [i] intentional discrimination (disparate treatment); [ii] disparate impact; and [iii] failure to make a reasonable accommodation.'" *Brief* v. *Albert Einstein Coll. of Med.*, 423 F. App'x 88, 90 (2d Cir. 2011) (summary order) (quoting *Fulton* v. *Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (internal quotation marks omitted)).  Plaintiff argues that Defendant was on notice, or should have been on notice, of her disability, and that more importantly, it failed to accommodate her disability when asked to do so.  Defendant, by contrast, disputes that it was notified of Plaintiff's disability, or that Plaintiff requested any accommodation.  Here, too, material issues of fact preclude summary judgment on both elements of the third prong of Plaintiff's claim.

### i.    Whether Defendant Was Notified of Plaintiff's Disability

First, a defendant is not liable for failure to provide a reasonable accommodation under the ADA if the plaintiff does not ask for an accommodation, or fails to provide information necessary to assess the request for an accommodation.  *See, e.g.*, *Woolley* v. *Broadview Networks, Inc.*, No. 01 Civ. 2526 (GEL), 2003 WL 554754, at *8 (S.D.N.Y. Feb. 26, 2003) (internal citations omitted).

Defendant argues that it was not on notice of Plaintiff's disability, since she did not register as a disabled student, obtain a "disability card," or provide medical documentation for her claimed disability.  (Def. Br. 6-8).  In support, Defendant rests almost entirely on Carrington's testimony that he did not view Plaintiff as having a disability, and was unaware of her thalassemia.  (*Id.* at 8).  This assertion is refuted by Grabin's specific testimony, which the Court must accept as true, that she told Carrington and numerous other administrators, on multiple occasions in November and December 2010, that her infections were directly related to her thalassemia, and that she needed an accommodation as a result.  *See generally* Background Sec. A(7).

In response, Defendant argues that Grabin's testimony must be disregarded because she "produce[d] no writings or other documentation that would substantiate her claim," and did nothing to refute the "sworn testimony of her professor and two College administrators that she did not request an accommodation."  (Def. Reply 8).  Yet Defendant fails to grasp that Plaintiff did refute this testimony — with her own sworn testimony.  Quite simply, any determination of Grabin's or, for that matter, Carrington's, credibility is a function for the jury, not the Court.  *See Rule* v. *Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (internal citations omitted)).  No matter how incredible Defendant and its counsel may believe Plaintiff to be, the fact remains that it has done nothing to refute much of her testimony, and that which it has called into

31

question remains a material issue of disputed fact that forecloses summary judgment.

Importantly, Plaintiff's testimony reveals that she informed a number of administrators of her disability both at the time she transferred to Marymount, and repeatedly throughout the fall 2010 semester. *See generally* Background Sec. A(3), (6), (7). What is more, Plaintiff testified that these same administrators told her that she did not need to submit documentation or doctor's notes, and that they would "take care of everything." Defendant has introduced no facts to dispute this testimony, instead choosing to rely upon blanket declarations to the contrary in its moving papers.

Accepting Plaintiff's testimony to be true, a reasonable fact-finder could determine that Plaintiff notified Marymount repeatedly and clearly regarding her disability, and provided documentation regarding the same. More specifically, Plaintiff repeatedly requested accommodations in order to complete Comm 225. It is also conceivable that a jury could determine that the statements of Marymount's senior administrators — telling Plaintiff, among other things, that "everything would be taken care of" — reasonably conveyed to Plaintiff that she had properly notified Marymount of her disability and had requested an accommodation of that disability. (Grabin Tr. 409).

Defendant ascribes significance (undue, as it turns out) to the fact that it had a published procedure for obtaining a "disability card"; from this it argues that because it has no record of any such application, that fact alone is conclusive proof that Plaintiff did not request an accommodation. (Def. Br. 6-

32

8).  Defendant cites *Kaltenberger* v. *Ohio Coll. of Podiatric Med.*, 162 F.3d 432,

437 (6th Cir. 1998), for the proposition that it was under no obligation to

accommodate Grabin if she did not follow Marymount's internal rules and

regulations for requesting an accommodation to the letter.  (Def. Br. 6).  This

proposition has not been explicitly adopted by the Second Circuit, and the

*Kaltenberger* case is inapposite for the reasons discussed *infra*; yet even

accepting this maxim, the Court must accept as true Plaintiff's sworn

testimony that that she repeatedly notified Defendant of her disability, was told

that she did not need to submit doctor's notes even though she did so, and

requested specific accommodations of that disability.  That Defendant has no

record of Plaintiff's request does not, without more, refute her testimony that

she made such a request.  Whether and to whom Plaintiff requested an

accommodation, along with whether that request was sufficient, are disputed

issues of material fact, such that summary judgment is inappropriate.

### ii.   Whether Defendant Failed to Accommodate Plaintiff's Disability

Second, material issues of fact also preclude summary judgment on the

issue of whether Defendant failed to accommodate Plaintiff.  It is well-

established that a defendant "need not make an accommodation at all if the

requested accommodation would fundamentally alter the nature of the service,

program, or activity."  *Powell*, 364 F.3d at 88 (internal citations omitted).

Indeed, the Second Circuit has held that "[w]hen reviewing the substance of a

genuinely academic decision, courts should accord the faculty's professional

judgment great deference."  *Id.* (citing *Regents of Univ. of Mich.* v. *Ewing*, 474

33

U.S. 214, 225 (1985)).  However, discrimination laws do not require "an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person."  *Southeastern Cmty. Coll.* v. *Davis*, 442 U.S. 397, 413 (1979).  "[W]hile a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones."  *Alexander* v. *Choate*, 469 U.S. 287, 300 (1985) (analyzing *Davis*).  Lastly, the "determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it."  *Staron* v. *McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir. 1995) (internal citations omitted).

There is no evidence that Plaintiff's requested accommodation — that she be permitted to make up missed in-class or group work — was a request that would fundamentally alter the requirements for a communications degree.[12] Moreover, that Plaintiff's other instructors that semester were able to — in Plaintiff's own words — "accommodate" her, indicates that those accommodations did not fundamentally alter the requirements for a

---

[12]   Jackson avers in connection with this motion that Plaintiff's requested accommodation was "effectively that she be issued a passing grade and awarded a degree even though she could not demonstrate that she had satisfactorily completed the requirements for Comm Arts 225." (Jackson Decl. ¶ 10).  This is a misstatement of the record.  Grabin did not seek to obtain a passing grade without doing any of the accompanying coursework; instead, she offered numerous ways to make up the missed in-class work, by submitting extra projects or spending significant time in the computer lab.  *See* Background Sec. A(7), (8).

communications degree.  On this basis, this case is inapposite to those cited by
Defendant, which deal with accommodation requests that fundamentally alter
the course requirements in the health care profession, or the requirements
necessary to obtain a medical degree.  *See, e.g.*, *Powell*, 364 F.3d at 88
(upholding grant of summary judgment to defendants where "[p]ermitting a
student who did not definitively prove her mastery of basic medical sciences to
advance into the later stages of medical school, and become a treating
physician who had direct contact with patients was something the medical
school correctly believed would unreasonably alter the nature of its program");
*Brief*, 423 F. App'x at 92 (upholding grant of summary judgment for defendants
where permitting student to continue on at medical school despite having failed
several exams, which in and of itself required dismissal, was an unreasonable
accommodation); *Kaltenberger*, 162 F.3d at 437 (noting that "[w]e should only
reluctantly intervene in academic decisions 'especially regarding degree
requirements in the health care field when the conferral of a degree places the
school's imprimatur upon the student as qualified to pursue his chosen
profession'" (internal citation omitted)).  These cases are qualitatively different
from the instant case, not least of which because they were rendered upon
more completely developed records than has been presented to this Court.  Yet
most importantly, these cases are factually distinct from the instant case.
Here, Plaintiff sought an accommodation for several assignments in one

course — a web design seminar — towards her communications degree, not to be excused from passing her first year of medical school.[13]

Taking Plaintiff's testimony to be true, Plaintiff requested additional ways to make up the in-class work she missed during her allegedly excused absences. The record indicates that Plaintiff came to Carrington immediately upon her return, and before the course ended, and offered to do "anything" to make up the missed work. In fact, there is evidence that Plaintiff spent her winter break developing an entire website, in the hopes that this would satisfy the missed course work. (*See* Wade Decl. Ex. 2). As noted above, material issues of fact — specifically, as to whether Plaintiff requested an accommodation, and whether that requested accommodation was reasonable — preclude summary judgment on Plaintiff's claim.[14]

## CONCLUSION

For the reasons set forth herein, material issues of fact preclude summary judgment on Plaintiff's claim. Accordingly, Defendant's motion for summary judgment is DENIED. The Clerk of Court is directed to terminate

---

[13]    In reply, Defendant argues that Plaintiff's testimony is insufficient because she failed to produce "a single one of the missing assignments," nor "e-mails that would have substantiated her claim." (Def. Reply 9). While this failure is noteworthy and may undermine Plaintiff's testimony at trial, it does not entitle Defendant to summary judgment. First, Defendant has produced no evidence, beyond Carrington's testimony, demonstrating that Plaintiff did *not* submit these assignments. *See* n.5, *supra*. Second, Plaintiff's testimony is sufficient at this procedural posture to create a disputed issue of material fact as to whether she submitted the assignments, as she says she did.

[14]    Plaintiff raises various arguments of questionable relevance in opposition. (*See* Pl. Opp. 5-7 (regarding the Code of Federal Regulation), 7-8 (Marymount's duty to report)). However, given that the Court has denied summary judgment on the substance of Plaintiff's claim, the Court need not address these issues.

Docket Entry 52.  The parties are hereby ORDERED to appear for a pretrial

conference on **June 24, 2014, at 1:30 p.m.**

      SO ORDERED.

Dated: June 10, 2014
      New York, New York

_____
     KATHERINE POLK FAILLA
    United States District Judge